# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KEITH HODDENBACH, | |
| Petitioner, | Case No. 23 C 16290 |
| v. | Honorable Sunil R. Harjani |
| ANDREA TACK, Warden, | |
| Respondent. | |

## MEMORANDUM OPINION AND ORDER

Petitioner Keith Hoddenbach is serving a prison term of eighty years for first-degree murder and thirty years for attempted murder, which are being served consecutively. Petitioner is currently in the custody of Respondent Andrea Tack, warden of Dixon Correctional Center. Presently before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 and Respondent's motion to dismiss. For the reasons stated below, the Court denies the petition, declines to issue a certificate of appealability, and grants the motion to dismiss.

## Background[1]

On December 11, 1984, 15-year-old Santos Martinez was shot and killed at a Vienna Hot Dog Stand. Richard Figueroa and Roberto "Keke" Rivera were also shot and wounded in the incident. On December 19, 1984, Petitioner Keith "Popeye" Hoddenbach was arrested at his residence in connection with the shooting. Co-defendant Rafael "Duce" Maldonado was also

---

[1] In reviewing a petition for federal habeas corpus, the Court must presume that the state court's factual determinations are correct unless Petitioner rebuts those facts by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Weaver v. Nicholson*, 892 F.3d 878, 881 (7th Cir. 2018). Petitioner does not challenge any of the underlying facts in his petition. The Court therefore adopts the recitation of the facts set forth in the Illinois Appellate Court's order denying Petitioner's second and third postconviction appeal, *People v. Hoddenbach*, 2023 IL App (1st) 092393-U, 221 N.E.3d 332 (Ill. 2023). The facts regarding the procedural history of this case come from the petition and the state court record that Respondent provided pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts.

arrested in connection with the same incident. Petitioner was charged with two counts of murder, two counts of attempted murder, six counts of aggravated battery, three counts of armed violence, and one count of conspiracy. Defendants, Maldonado's and Hoddenbach's trials were severed. Prior to trial, Petitioner filed a motion to quash and suppress his arrest. The trial court denied Petitioner's motion.

Following jury deliberations, Petitioner was convicted of the murder of Martinez, and attempted murder and aggravated battery of Figueroa. The trial court merged the two murder counts into one count, and the aggravated battery counts into the conviction for attempted murder of Figueroa. As the current Petition relies in part on Petitioner's assertion that he is actually innocent based on recantations of several trial witnesses, the Court begins by detailing the relevant trial testimony.

## I.  Trial Proceedings

Figueroa testified that he was 13 years old at the time of the incident, and at the Vienna hot dog stand with friends on December 11, 1984. He said that the restaurant was brightly lit and he was there watching his friend Rivera, who he met the day before, playing video games. There were six or seven other people in the restaurant, including Dwight Littleton, Jesse Lanzarin, and Martinez. Figueroa knew Rivera was a member of a gang called the Disciples. At some point, Lanzarin told Rivera that someone was pointing a gun at Rivera's head. Figueroa looked back at the door, saw no one there, and turned back to the games. Someone said "he is back" and Figueora looked at the door and saw a man standing two feet from the front door inside the restaurant wearing gloves and holding a black pump shotgun in his hands slightly above his waist. The man was wearing black pants, a black jacket that came to his thighs, a gray scarf on his face covering up to his chin, and a black ski hat that came down slightly above his eyebrows. Figueroa could

see the shooter's eyes, lips, cheeks, black mustache, and mouth. He described the shooter as a husky "dark-skinned Hispanic" about 19 or 20 years old between five-foot-five and five-foot-seven. Figueroa identified Petitioner as the shooter in a photo array and in court.

Figueroa watched the shooter's face and gun as the shooter was looking from side to side and as he pointed at the counter, pumped the shotgun, and fired. After the first shot, the shooter pointed the gun towards the pay phone where Martinez was standing and then fired. After the second shot, Figueroa tried to run, but Petitioner fired two more shots and Figueroa was hit on his left leg. Rivera was shot on his buttock. Figueroa hid behind the video games consoles and did not hear anymore gunshots. When Figueroa came out, the shooter was gone, and Martinez was lying on the ground. Figueroa was taken to the hospital where he gave detectives a description of the shooter.

Figueroa identified Petitioner as the shooter in a lineup and also testified in court that neither the police nor anyone else who was a witness to the shooting told him to identify Petitioner as the shooter. On cross-examination, Figueroa testified that the shooter had been about 15 to 20 feet away from him. He denied telling the officers that the shooter was wearing a ski mask and clarified that it was a black ski hat that came down to his eyebrows and that the scarf was not covering the shooter's face. Figueroa reconfirmed that Petitioner was the individual he had identified in the lineup.

Next, Dante Carranza testified that he was at the restaurant watching his friends play video games when he heard someone say "somebody is at the door with a gun," looked at the door, and saw a person with a gun standing there. Carranza identified Petitioner as the shooter in a lineup and in court. Carranza testified that the shooter's black hat came down to his eyebrows and a scarf covered his ears, but he could see the shooter's cheeks, chin, and nose.

George Cordova testified that he was sitting in the front seat of a parked car on the street where he could still see the restaurant. Cordova testified that a light blue Monte Carlo car pulled into the alley behind the restaurant. He observed someone emerged from the passenger seat while the car was still running. The individual wore black clothes, a black jacket, and a scarf which was hanging from his shoulders. He did not see a hat, but he noticed that there was "something in his hands that was long." Cordova saw another person in the car but could not identify them. Cordova observed the first individual walk up to the front doors of the restaurant, open the door, and point a gun. The individual then left the restaurant and walked to one side of it. Cordova saw that "he was doing something to whatever was in his hands." Cordova watched the individual walk back into the restaurant, open the door, and point a gun. Cordova heard "loud noises," and then saw the individual leave the restaurant and run back out to the parked car in the alley. The individual got back into the passenger seat, and the car drove off quickly. Cordova testified on cross examination that the car was about 75 feet away and he was 50 feet from the restaurant and could not see the shooter's face.

Dwight Littleton was also in the restaurant during the shooting and testified at Petitioner's trial. Littleton overheard Lanzarin say that a man had come into the restaurant and pointed a gun at Rivera. When Littleton looked towards the door, he did not see anyone. He turned back towards the game and then someone said, "here he comes again." Littleton turned back to the door and saw a man wearing gloves, a black jacket, a black skull knit cap that came down to his eyebrows, and a gray scarf that covered his chin and ears, who was holding a black pump shotgun at his waist. He could see the shooter's mouth, nose, half of his cheeks, and black moustache and that his right eye was "cross-eyed." The shooter was 20 to 21 years old, was about five foot six or seven inches, and was chubby, between 150 to 160 pounds. Littleton testified that he could see Petitioner's face

"the whole time," and observed Petitioner point a gun at the counter, pump and fire. Littleton went with the police officers to the station that night and gave a statement. Littleton told police that the shooter's right eye was "kind of crooked." Later, Littleton identified Petitioner as the shooter in a lineup and in court, and he picked the Petitioner's photo out of a photo array.

Chicago Police Officer William O'Connor testified that he responded to the homicide at the hot dog stand on December 11, 1994. He located a fired shotgun shell in the parking lot and three shells inside the restaurant.

Officer Howe was a gang crimes specialist and detective. On December 11, 1984, at 11:30 p.m., he and his partner began investigating a homicide. The suspect's description was a white Hispanic male, 17 to 18 years old, five-foot-four to five-foot-seven inches, between 140 and 160 pounds, a moustache and was wearing dark clothing, a knit dark hat, and a gray scarf. They did not locate anyone that night. On December 19, 1984, Howe located and arrested Petitioner at an apartment. Petitioner asked for the police to retrieve a jacket from his bedroom, which is where Howe saw a black shotgun propped up against an open closet door, as well as a shotgun shell. Howe took custody of both for processing.

Howe was present for the lineup consisting of five people, including Petitioner. Littleton and Lanzarin viewed the lineup separately, and both identified Petitioner as the shooter. Howe testified that he had been given a composite description of the shooter after the incident, but that the description did not include any description about the offender's right crossed eye, which he said he would have included if a hypothetical witness had given him that detail.

Jesse Lanzarin testified at trial that he had been about 20 feet away from the door and that the shooting lasted 30 seconds and that he could see the shooter throughout the entire incident. Lanzarin saw a white man, dressed in black, with a ski hat on his head, black gloves, and a gray

scarf that covered from his ears to his chin, with a gun come through the front door.  The man pointed the gun at Rivera and cocked it, but nothing happened.  The man then backed outside, but Lanzarin did not see where he went.  Lanzarin went over to Rivera and told him that someone had cocked a gun at him.  Both he and Rivera looked at the door, and the man came back inside the restaurant.  Lanzarin could see his face from his position in the restaurant and saw him point the gun at the telephone where Martinez was standing, cocked it, and shot it.  Lanzarin was still able to see his face but began to run to the back of the machines, while Rivera stood there.  Lanzarin went with the officers to the station to talk with them.  He came back on December 19, 1984, and identified Petitioner in a lineup as the shooter; he also identified Petitioner in court.  Lanzarin testified that he was not told who to pick in the lineup and that he told the officers the shooter was wearing the gray scarf that did not cover his face and came down to the middle of his chin.  He described the shooter's hat as a ski mask which came down to his forehead, above his eyebrows, and that he could see the shooter's nose, eyes, mouth, and moustache.  The shooter was between 18 to 20 years old, "chubby," and did not have other facial hair.  When asked if he had noticed anything unusual about the shooter's eyes, he said that he told police that "one of his eyes was hanging low," but did not tell them which eye.

Richard Chernow was a police officer in the department's crime lab as a firearms technician.  He analyzed the four shotgun shells recovered from the restaurant and found that they were all fired from the same shotgun.  In his opinion, the four shells had been fired from the pump shotgun recovered from Petitioner's residence to the exclusion of other firearms.

Robert "Keke" Rivera was called by the defense.  He testified that on December 11, 1984, he went to the restaurant around 7 p.m.  While walking to the restaurant, he saw a blue Chevy Malibu or Cutlass and its occupants made a "type of sign language" at him and he made one back.

When he first saw the car, he was about two blocks from the restaurant. He saw the car a second time about a block away from the restaurant, a few minutes before the shooting. After being in the restaurant for less than five minutes, he was playing a video game when he saw a person come in with a gun. The person opened the doors, came inside, and then started firing towards the counter, then to the pay telephone, and then towards Rivera. Rivera ran for cover between two gunshots and hid behind the video games. Rivera was wounded in the buttocks. Rivera went to the hospital, and police interviewed him. Rivera looked at "hundreds of photos," of individuals and picked out two photographs with the names "Sergio Mahon" and "Tony" because their photos were similar in build and face to the shooter. After leaving the hospital about a week later, Rivera saw a lineup that did not include Sergio and Tony. Petitioner was in the second lineup he saw, and Rivera identified him as the shooter. On cross-examination, Rivera testified that he was not told by anyone who to pick out in the lineup. Rivera identified Petitioner as the shooter and the gun used. Rivera admitted to being a member of the Latin Disciples, and that the sign flashed by the occupants of the blue car signified that they were also fellow gang members. Rivera stated that Petitioner had been seated in the passenger seat of that car, but that he could not make out who the driver was.

Laura Maglaya was Petitioner's girlfriend and common-law wife. She testified for the defense that they had been living together on December 11, 1984, with their daughter. December 11 was their daughter's birthday and they had been planning to celebrate with family, including Lucy Rosario, that night. She arrived home at their residence at 5:30 p.m., and Petitioner was already there. Maglaya was shown a picture of a shotgun and identified it as the one that was located in their bedroom closet. She described it as the "house gun," and that she had seen it for the first time a few days prior when "someone came to the door," although she did not know who it was. Petitioner and the individual talked for a few minutes, and then Petitioner put the gun in

their bedroom.  On cross examination, Maglaya admitted that she did not go to the police station and did not tell them that Petitioner had been with her on December 11 when he was arrested.  However, she stated that she did tell Detective Kaupert of Petitioner's whereabouts the day of the shooting after he was arrested.

Lucy Rosario was called by the defense and testified that she was Petitioner's aunt.  On December 11, 1984, she arrived at Petitioner's home around 6:20 or 6:30 p.m.  Petitioner's daughter, Maglaya, and Petitioner were there.  She left around 8:55 p.m.  On cross-examination, Rosario testified that she and Maglaya had spoken about the alleged murder and at what time it allegedly occurred.

## II.     Direct Appeal

On direct appeal, Petitioner challenged the trial court's denial of his motion to quash and suppress asserting a violation of his fourth amendment rights in that there were no exigent circumstances that justified his warrantless arrest. *People v. Hoddenbach*, 169 Ill. App. 3d 499, 500 (1988).  The Illinois appellate court rejected Petitioner's claims, holding that the trial court had properly found that there were exigent circumstances to justify the arrest, the police had made a good faith effort to obtain a warrant, there had been no deliberate or unjustified delay by the police to obtain a warrant, probable cause existed at the time of arrest, and that overall, the police had acted reasonably given the circumstances of the requisite alleged crimes.

## III.    First Postconviction Petition

On January 3, 1992, Petitioner filed his first *pro se* postconviction petition which alleged five claims.  First, Petitioner alleged ineffective assistance of trial counsel where defense counsel had: (1) called Rivera as a witness, who had undermined Petitioner's alibi defense when he identified Petitioner as the shooter; and (2) failed to tender a jury instruction that prohibited prior

8

inconsistent statements of three prosecutorial witnesses to be used against him as substantive evidence. Second, Petitioner alleged "improper prosecutorial conduct" where the State, in violation of a prior court ruling, elicited testimony from Detective Howe that allowed the jury to conclude that Petitioner had been implicated in the shooting by his co-defendant. Third, Petitioner challenged the constitutionality of consecutive sentences for multiple offenses arising out of a single incident. Fourth, Petitioner alleged that the trial court had abused its discretion by imposing an extended sentencing term. Fifth, Petitioner alleged ineffective assistance of appellate counsel, in that appellate counsel failed to argue on direct appeal that trial counsel's performance was objectively unreasonable.

On January 14, 1992, the postconviction court summarily dismissed the petition, finding that the petition raised claims that Petitioner could have raised on direct appeal. The state appellate court affirmed the circuit court's dismissal in *People v. Hoddenbach*, 674 N.E.2d 955 (May 19, 1994).

## IV.     Second Postconviction Petition

On April 25, 2002, Petitioner filed a second postconviction petition, arguing that the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), applied retroactively to his conviction and made his sentence unconstitutional. Petitioner was appointed postconviction counsel. On September 17, 2003, the State filed a motion to dismiss the petition, arguing, among other things, that *Apprendi* did not apply retroactively to Petitioner's conviction. The postconviction court granted the State's motion the same day. The Illinois appellate court affirmed the postconviction court's decision in *People v. Hoddenbach*, 889 N.E.2d 808 (April 28, 2005). On March 28, 2007, the Illinois Supreme Court denied Petitioner's motion for leave to

appeal in a supervisory order and vacated the judgment and remanded to the circuit court to demonstrate compliance with Rule 651(c). *People v. Hoddenbach*, 863 N.E.2d 255 (2007).

Following remand, postconviction counsel was appointed to the case. On April 30, 2009, counsel for Petitioner filed a new Rule 651(c) certificate, which stated that he did not have any changes to the petition already on file. However, counsel attested that the operative petition did not contain the total sum of Petitioner's postconviction contentions, specifically that he had a "reasonable argument" for his innocence and had compiled multiple affidavits from individuals who had previously testified against him and then recanted their testimony. On May 14, 2009, counsel for Petitioner filed a motion for leave to amend the petition based on those contentions. On June 11, 2009, counsel filed an additional Rule 651(c) certificate, wherein he attested to consulting with his client and sought to add two further issues to the petition. That same day, the postconviction court entered an order denying all the defense motions. On July 9, 2009, Petitioner's counsel filed a motion to reconsider contending that the postconviction court had originally allowed for amendment of Petitioner's *pro se* petition on May 14, 2009, rather than proceed in "piecemeal fashion." The motion was denied, and a timely notice of appeal was filed.

### V.    Third Postconviction Petition

On July 8, 2009, Petitioner filed a third postconviction petition, asserting claims for actual innocence and ineffective assistance of counsel. On his actual innocence claim, Petitioner asserted that he had obtained recantations of numerous eyewitnesses, and that the police had coerced false testimony against him. For his ineffective assistance of counsel claims, Petitioner alleged that his trial counsel, in violation of *Strickland v. Washington*, failed to investigate and interview an individual named Sabrina Vazquez, who would have offered possible exculpatory testimony on his behalf. Petitioner also alleged that trial counsel had failed to investigate statements made by his

co-defendant, Maldonado. In support of his petition, Petitioner attached numerous affidavits, including those from: (1) Maldonado; (2) Carranza; (3) Figueroa; (4) Rivera; and (5) Vazquez.

### a. Initial Witness Affidavits

In his affidavit, dated March 22, 2008, Maldonado averred that he had received a shotgun from someone named "Carlos" on the day he committed an armed robbery. The police found Maldonado and asked him about a shooting that had occurred in a restaurant. Maldonado said he did not know anything about the shooting, and the police threatened him and began to "beat him up." Maldonado asserted that he "told them who he sold the shotgun to," in that he had sold a shotgun to a "guy [he] had just met for the first time after I did the robbery home invasion." He stated that the police had him "look at some gang books." Maldonado picked Petitioner's photo as who he sold the shotgun to, and he said he sold it to a man named "Popeye." The police subsequently arrested Petitioner. Maldonado averred that police continued to assault and threaten him and told him that he was going to implicate Petitioner for the shooting. Maldonado asserted that he "lied on [Petitioner] to save [him]self and in the process had sent an innocent man to prison." He stated that "his friend Carlos was the one who killed that kid in the restaurant" when Maldonado asked him for the shotgun.

Carranza's affidavit stated that he had told police that the shooter "could not be identified," but the police told him that "they w[ould] tell me who did it and what I should say." He attested that he was told who to pick out in the lineup and in court. Carranza averred that the shooter had "his face and head covered and there [was] no way anyone could identify the person that did it."[2]

Figueroa's affidavit averred he had told police that he "did not know who shot" him, and that he could not see the shooter's face because he had been wearing a ski mask. Figueroa attested

---

[2] Although Carranza did not testify at the postconviction hearing, the State's investigators conducted an independent interview of him, and reported that Carranza confirmed the veracity of his affidavit.

11

that, while at the police station, he was shown a picture of Petitioner and was told to pick him in the lineup. He stated that the police had indicated that they would "tell him what to say in a statement about what took place that night," despite him continuing to tell them that he did not know who shot him. He asserted that the police told him to "shut up" and "do what they told him to do" because otherwise, he would be "going to jail for not helping them lock up [Petitioner]." Figueroa asserted that both "[CPD] and the State's Attorney['s] Office had [him] lie in [his] statement [and] in court *** so that they could send *** [Petitioner] to prison [and] close their case." Figueroa concluded by stating that [Petitioner] was not the one who shot him, and that he had "lived in guilt for over 20 years [sic]" because he had "allowed both the [CPD] [and] the State's Attorney['s] Office to use [him] to send defendant to prison[.]"

Rivera attested that on the night of the shooting, he had been walking a family member home when he saw "Sergio Mayett and Tony, two Latin Kings" who he identified to the police after the shooting. A week later, the police approached him, showed him a picture of Petitioner and two others, and said that "these are the guys we want you to say who did it, and here is a picture of his car." Rivera told police that was not the car he saw on the night of the shooting. Police responded by saying that if Rivera did not identify Petitioner, "the next time something happened around the neighborhood[,] [he] was gonna go down for it." So, Rivera "did what they said and changed what [he] told several officers when this happened." Rivera attested that "[f]rom that time on we all stuck with what they told us and identified these guys out of the line-up and even went with this story all the way to trial and got them convicted." Rivera further stated that, prior to trial, he had communicated with Maldonado and Petitioner on the phone and told them he would tell the truth, which was why Petitioner's trial counsel had called him as a witness. However, when called to the stand, Rivera "got scared of what the gang-crime detectives told [him]

they would do to [him,] so [he] got on the stand and lied." Rivera attested that he "said what the detectives wanted [him] to say and the state's attorney *** prep[ped] [him] for trial." Finally, Rivera stated that he made several attempts to contact Petitioner to sign an affidavit on his behalf because he had "helped put an innocent man away."

The petition also contained a copy of Sabrina Vazquez's statement to Detective Weingart and an assistant state's attorney, dated December 19, 1984. The statement provided that on December 11, 1994, Vazquez was at a liquor store near the location of the shooting and heard gunshots on the way to a friend's apartment. While standing in the hallway of the apartment, Vazquez encountered an individual she knew as "Duce" (Maldonado's street name), wearing an entirely black outfit. Vazquez asked him about the gunshots, and Maldonado stated, "he knew about them" and that "he was the one who shot those kids." Maldonado further told her that if she said anything, "something would happen to [her]." Vazquez also noticed that there was a barrel shotgun sticking out of his jacket, and that he was breathing heavily. Maldonado asked Vazquez to hide him, and she refused. Maldonado then left the hallway and got into a car.

### b. Amended Petition

On August 25, 2010, postconviction counsel was appointed to represent Petitioner on the amended petition. On June 9, 2015, Petitioner's counsel filed a Rule 651 Certificate, and a supplemental petition, which argued that Petitioner was actually innocent because: (a) Maldonado was the actual shooter; (b) Vazquez had told police that Maldonado had admitted to her that he had committed the shooting; and (c) various witnesses who had testified against Petitioner were told to identify him as the shooter, despite telling police that the shooter was unidentifiable due to the ski mask he was wearing at the time. The supplemental petition did not contain any additional claims against Petitioner's defense counsel, and attached the previously filed affidavits of

Figueroa, Carranza, and Rivera. It also attached new affidavits from, of relevance here: (a) Maldonado, dated in August 2013; (b) Lanzarin; and (c) Vazquez.

Maldonado's new affidavit reiterated that he had sold a shotgun to Petitioner, but now averred it was him who had killed Martinez and that he had previously given a false statement as he was worried about the death penalty and believed he "would [have] gotten a break from" a separate conviction. Lanzarin's affidavit stated that the shooter had been wearing a bandanna over his head "down to his eyes" and a cloth covering his face, and only his eyes were visible. Lanzarin asserted that he could not identify the shooter, but that while at the lineup, police had told him to identify Petitioner "or else we would be charged." Lanzarin said that he did so because he had been "young and scared." Vazquez's affidavit attested to similar facts to the statement she provided to police in 1984. She further stated that after she gave a statement, she was never contacted by lawyers and never went to court on the matter.

### c. Postconviction Evidentiary Hearing

The State filed an answer to the petition and the matter was set for an evidentiary hearing, beginning on January 23, 2020.

### a. Vazquez's Postconviction Evidentiary Hearing Testimony

Vazquez testified that at 7:08 p.m. she was at a liquor store playing video games with friends when she heard gunshots. She later walked to her friend's apartment and encountered "Duce," Maldonado's street name, who was wearing all black clothing. She testified that Maldonado was "bragging on a situation," meaning "what had happened as far as the shooting and said he did it" and that Duce wanted help because "he was on the run of it." Duce opened his coat and she saw a gun but could not identify the type. Vazquez asked Duce "if he was for real" as to whether he was responsible for the shooting and "he said yeah." Vazquez did not help him because

"she wasn't getting into that situation" and told him as much. He responded that "it could happen to [her]." After their conversation, Duce drove off in a car with some people, and that was the last time she ever saw him. Later that same day she met with the police, and they drove her around looking for Duce. Vazquez did not recall talking to any attorneys about the case, until recently when she was contacted by one of Petitioner's family members.

On cross-examination, Vazquez testified that she went to the police station, told them what Duce told her, and the police wrote this information down. The police brought her back to the station a week later to view a lineup, where she identified Duce as the person she saw that night. Vazquez did not identify Petitioner, as she had not seen him. Vazquez did not see the shooting, did not know what car Maldonado left in, or how many people were in it.

The court then questioned Vazquez, who said she had known Duce for "a couple of years," that he was Hispanic, and that she did not know if he was in a gang. She testified that he was about the same height as her, at five foot three inches. She stated that Duce "flashed" his gun at her, but that she did not know what type it was and had only seen the barrel. She believed it was probably a bigger gun based on the way it was positioned, but she did not get a good look at it. The court asked Vazquez what Duce's exact words were, and she said that he had "just shot up a place with some kids in there." The court asked if Duce had stated if he had done it alone, and she responded, "He didn't say. I didn't ask either."

### a. Rivera's Postconviction Evidentiary Hearing Testimony

Next, Rivera was called as a defense witness.[3] Rivera testified that he remembered the events of December 11, 1984, because he was shot. He testified that he was playing a video game when someone, either Lanzarin or Figueroa, tapped him on the shoulder and said, "hey, this guy is

---

[3] Rivera testified that he was currently serving six years for a drug conviction and that he had other felony convictions.

pointing a gun at you." He turned around but did not see anyone, so he went back to playing video games. Rivera then heard shots and looked back to see a shooter. He went for cover but got hit on his left buttock. Rivera testified that he had not been able to see the shooter because the person was wearing a mask. At the hospital, police gave him a photo book of Latin Kings gang members and asked if he recognized anyone. Rivera picked out "Sergio" and "Tony." After a week or two, officers "showed him cards in the parking lot" and then took him to the police station. They brought him up to the second floor to a room where a shotgun and an ID had been placed on the table. Rivera testified that the police told him "this is the guy right here." Rivera said that the ID on the table was not of Sergio or Tony, and he did not know who the person was. Rivera testified that he said nothing during these interactions.

The police then conducted a lineup, and Rivera testified that the officers kept telling him "you know who it is, all you got to do is point him out" and that "whatever else goes down in the neighborhood, it's going to all fall on [him]." Rivera testified that he picked out the individual of whose ID they had shown him earlier and that he had never seen the person he eventually picked out. However, he knew to pick him out because "they had told [him.]" He testified that the whole time, officers told him "just remember this guy here." Rivera said that "he did what they asked." Rivera testified that the police showed him a car parked at the police station and asked him if he recognized it. Rivera testified that he "just looked at them" and confirmed that it was the car, but he did not believe it was the vehicle involved in the shooting. Rivera did not tell police that he did not think Petitioner was the shooter, because "they were the ones dictating the pace."

Rivera said that he testified against Petitioner "against his will." He recalled that his testimony was that he was walking down the street with a family member to bring her home, when he "ran into some guys in a premiere vehicle," a Gran Torino, and that Sergio and Antonio were in

16

the car. He recalled identifying Petitioner in court because "the police said to do it." When asked if he had testified that the police had told him to pick out Petitioner as the shooter, Rivera said he did not. When asked if his previous testimony was that Petitioner was the one that shot him, Rivera testified that "it wasn't true" and that he had testified as such because of his negative interactions with police officers in his area. When asked if the police had ever physically abused him while they were questioning him, Rivera testified that they had "in general, in the past, but not then." He admitted that he was in the Young Latin Organization Disciples at that time. Rivera confirmed that he did not know Petitioner, but that he had spoken with him one time over the phone and that Maldonado had made the phone call. When asked how he knew Maldonado, Rivera testified that he was a "friend of the family" and that Maldonado "used to come to the house." During the phone conversation, Rivera told them he was not going to go to court because he knew "that this guy didn't shoot me" as the shooter had been wearing a mask. When asked if he had identified Petitioner in court as the shooter, he confirmed that he did.

Rivera testified that the shooter had been wearing a black ski mask, and that he could only see his eyes because of the mask. Rivera could not recall what the shooter had been wearing, but that it had been "all black[,] maybe." Rivera stated that no one had approached him to write his affidavit, and that he had decided to do so on his own. When first asked if a state's attorney had told him to lie, he responded "they all [say] lie." After being asked multiple times whether a state's attorney had asked him to lie, Rivera answered that "he was brought there" and did not "know who at the moment had [him]." Rivera was then presented with his previous testimony at trial. When asked about specific statements and questions, he said he did not recall them.[4] When asked if he

---

[4] Rivera was asked if he recalled being asked by Petitioner's counsel if he had picked out Sergio Mahon and whether that person may have been the shooter, or if Sergio resembled him. Rivera responded that he did not recall being asked that question. Rivera was asked if he recalled testifying that no one had told him

recalled his testimony that Petitioner was sitting in the passenger seat of that car, he responded that the police had told him to say it was Petitioner and that they told him "every little thing to say at trial" and to "bottom line, blame him."  Rivera was asked if the police had made up the story about Petitioner being in the car and gesturing gang signs at him.  Rivera responded that it had not been his testimony that the gang signs had been directed towards him, and that he had never seen Petitioner before.  Rivera admitted that his current testimony about the police having a shotgun and ID on the table when he arrived for a lineup was not in his affidavit, "but that doesn't mean it didn't happen."

The court asked if Rivera remembered someone in the neighborhood who went by "Duce," and Rivera testified that was "Rafael Maldonado" and that he was not tall, perhaps about five feet. Rivera confirmed that Maldonado had been a Latin King, and that it was fair to say that Rivera's gang and the Latin Kings had been "at war with each other."  Rivera testified that Maldonado would have had reason to shoot him "being that [he] was a disciple."

### a.  Lanzarin's Postconviction Evidentiary Hearing Testimony

Lastly, Jesse Lanzarin was called by the defense.  Lanzarin testified that on December 11, 1984, a man stepped into the restaurant, held the door open with one foot, and pointed a shotgun at Rivera.  The shotgun did not go off, so the man stepped back outside, and Figueroa told him and Rivera that a man had come in and pointed the gun at Rivera.  Lanzarin testified that all three of them stood watching the door, and the man re-entered and started shooting.  Lanzarin testified that the shooting happened quickly, and he did not see the shooter's face, just his eyes, and that he was wearing a bandanna that covered his eyes "all the way down."  He also had another bandanna covering his head, ears, and "everything else."  Lanzarin testified that he spoke to police outside

---

to pick someone out in a lineup.  Rivera responded that he did not recall.  Rivera also did not recall his testimony on cross-examination that he saw someone driving a car that had gestured gang signs at him.

the restaurant and then at the police station. The police took him to a lineup, pointed out Petitioner, and said he was the shooter. Lanzarin testified that the police warned him that if he did not say it was Petitioner, they would put drugs and guns on him and "lock [him] up." Lanzarin subsequently identified Petitioner in the lineup.

On cross-examination, Lanzarin admitted that he was convicted of armed robbery, and that he was in custody at the time he testified at Petitioner's trial. When asked if he recalled testifying that he was able to see the shooter's eyes, Lanzarin responded "that's all you could see, but it happened so fast you don't even remember." Lanzarin did not recall testifying that he could see the shooter's nose, mouth, or moustache. He did not recall if he had testified that one of the shooter's eyes had been "hanging low."

When the court then questioned Lanzarin, he admitted that he used to be a "gang banger" and had been involved with the police before. He had been in the YLO Cobras, and the individuals shot on December 11 were Cobras. Lanzarin did not know what gang the shooter was from, but he knew it was a gang incident. Lanzarin admitted that he had identified Petitioner as the shooter at trial, and that he had never seen him or known him before the trial. He also did not remember which police officer threatened him, but said it happened at the station. During the lineup, Lanzarin testified that the police officer had said to him "that's him right there, point him out." Lanzarin admitted that he had not mentioned anything at trial regarding the police threatening to frame him. When asked if he remembered giving a description of the shooter to the police at the restaurant before the lineup, Lanzarin responded that he had told them that the shooter had a bandanna from his eyes all the way down. He did not know the shooter's race, height, weight, or eye color because he had not been able to see anything beyond the shooter's eyes. Lanzarin also admitted discussing

19

what happened that night with his friends prior to signing the affidavit, but that none of them were able to come to court to testify about it.

After the testimony, Petitioner sought to introduce two unidentified affidavits into evidence. Counsel stated that they had been attached to the amended petition and were from two recanting witnesses who could not be located but requested the court "acknowledge" that they had been signed and notarized. The court allowed them to be filed but noted that it was "hard to attribute much weight [to them] without seeing the witnesses and having them be put under oath [and] subject to cross."

On September 1, 2021, following the conclusion of the evidentiary hearing and closing arguments, the postconviction court entered an oral ruling denying the petition in its entirety. The court summarized the underlying trial proceedings, and then observed that he had received 14 original affidavits, "enough *** so [the court] agreed to *** have this hearing," but that Petitioner had only presented three witnesses. The court noted that at trial Lanzarin had not testified that he had been coerced by any police officer, and at the hearing, Lanzarin was unsure which officer had threatened him. The court also observed that Lanzarin had only talked to his friends about the incident until Petitioner's counsel had him sign an affidavit. The state postconviction court determined that Rivera and Lanzarin were not credible and it questioned whether it could attribute weight to certain affidavits, other than acknowledging that they had been filed. On Vazquez, the court stated that she had described an encounter with Maldonado, as Petitioner's co-defendant, who had also been convicted for the same incident. Even assuming the statement was admissible, the court questioned whether Vazquez's testimony could exonerate Petitioner, given that there was more than one offender in this case. The court concluded that the new information was insufficient to show actual innocence or ineffective assistance of counsel and denied the petition.

20

### a. Postconviction Appeal

Petitioner appealed arguing the postconviction court erred in denying him a new trial based on his actual innocence claims. Specifically, that the newly discovered evidence from Rivera, Lanzarin, Figueroa, and Carranza, which all stated that they had been coerced by police to identify him as the shooter where the shooter had been otherwise unidentifiable, in combination with Vazquez's testimony, affidavit, and recorded police statement, were likely to have changed the result of the underlying trial.

The Illinois appellate court found that the recanting witnesses all provided consistent and detailed descriptions of the Petitioner at trial. Also, details about the shooter like his lower-set eye were not recanted. The state court also found that, unlike in cases where a recantation was sufficient, here there was physical evidence linking Petitioner to the crime—the murder weapon was found in his possession at his home. While the state court acknowledged that Maldonado's affidavits averred that he sold the shotgun to Petitioner after the shooting, Maldonado, a professed murderer, did not testify at the evidentiary hearing and the state court was unable to assess his credibility. The court noted that Maldonado filed two affidavits with shifting accounts of how the shooting occurred, which further undercut his credibility.

Petitioner also appealed the ruling that his counsel was not deficient for failing to investigate and present Vazquez's testimony. The postconviction appellate court found Petitioner's counsel's failure to interview Vazquez fell below the required level of reasonableness. However, the appellate court found there was no prejudice to Petitioner because Vazquez's testimony would not have changed the result of the trial, as she did not bolster Petitioner's alibi and she was not a witness to the shooting. Her testimony instead went to Petitioner's co-defendant Maldonado's

21

guilt, and he was tried and convicted for this shooting in a severed trial. The postconviction court also did not find Vazquez to be credible.

## Discussion

In his writ of habeas corpus, Petitioner brings four claims: (1) that exigent circumstances did not exist to justify his warrantless arrest; (2) the trial court erred in denying Petitioner's motion to quash his arrest and suppress evidence; (3) Petitioner's *pro se* postconviction petition was held to a more stringent standard than a formal pleading drafted by an attorney; and (4) Petitioner received ineffective assistance of counsel from his trial and appellate counsel.

## I.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") authorizes relief under 28 U.S.C. § 2254 only when the state court's decision on the merits of the petitioner's claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  In the Seventh Circuit, a state court decision is "contrary to" Supreme Court precedent if it either did not apply the proper legal rule or if the decision applied the correct rule but reached the opposite result from the Supreme Court on materially indistinguishable facts. *Meyers v. Gomez*, 50 F.4th 628, 641 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 1756 (2023).  A state court decision is "an unreasonable application of Supreme Court precedent when it applies that precedent in a manner that is 'objectively unreasonable, not merely wrong.'" *Id.* (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015)).  "AEDPA's standard is intentionally 'difficult to meet.'" *Woods*, 575 U.S. at 316 (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)).  Further, factual determinations of a state court are presumed reasonable unless a petitioner can show otherwise by clear and convincing evidence. *Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004).

However, for a petitioner to even raise a claim of error in habeas, state remedies must be exhausted. *Id.* at 648. "In order to preserve a federal claim for review in a habeas proceeding, a petitioner must first present it to the state courts through one full round of review, alerting those courts as to the federal nature of the claim when he does so." *Meyers*, 50 F.4th at 646. If a petitioner fails to bring the claims in state court and the opportunity to do so has lapsed, then he has procedurally defaulted on his claims. *Lieberman v. Thomas*, 505 F.3d 665, 669 (7th Cir. 2007).

## II.     Statute of Limitations

Generally, petitioners have one-year to file a federal habeas petition from when their conviction becomes final. 28 U.S.C. § 2244(d)(1)(A). However, petitioners whose convictions became final before AEDPA's enactment were granted a one-year grace period. *Johnson v. McCaughtry*, 265 F.3d 559, 562 (7th Cir. 2001). These petitioners had until April 23, 1997, to file their habeas petitions. Here, Petitioner's conviction became final on June 11, 1989, 90-days after the Illinois Supreme Court denied his petition for leave to appeal. Doc. [20-31]. As Petitioner did not have any appeals pending which would have tolled the statute of limitations, he had until April 23, 1997, to file his habeas petition. As this petition was filed on October 2, 2023, Petitioner's claims come 26 years too late and are time-barred.

However, to prevent miscarriages of justice, a habeas petitioner may use a claim of actual innocence as a gateway to proceed on time-barred habeas claims. *Dixon v. Williams*, 93 F.4th 394, 403 (7th Cir. 2024) (citing *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)). This path to constitutional challenges "balances concerns of finality and comity with the important 'concern about the injustice that results from the conviction of an innocent person [which] has long been at the core of our criminal justice system.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 325 (1995)). Here, while Petitioner contends that he is actually innocent as a gateway to proceed on his time-

barred claims, the bar to proving such a claim is onerous. Claims of actual innocence are "rarely successful." *Schlup*, 513 U.S at 324. The standard created by the Supreme court "is demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327).

Petitioner must establish that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327. When deciding the ultimate question of innocence, the court "must consider all the evidence, old and new, incriminating and exculpatory" and "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538 (cleaned up).

A claim of actual innocence must be both credible and founded on new evidence. *Schlup*, 513 U.S. at 324. For Petitioner's claim to be credible, the claim must have the support of "reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id.* As the Seventh Circuit has described "to demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Dixon v. Williams*, 93 F.4th 394, 403 (7th Cir. 2024) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)). The evidence must also be 'new' in that it was not before the trier of fact. *Arnold v. Dittmann*, 901 F.3d 830, 836–37 (7th Cir. 2018). The Court is not bound by the rules of evidence admissibility and instead must consider the probative force of the relevant evidence. *Schlup*, 513 U.S. at 327–28. "Although any delay or lack of diligence by the petitioner in pursuing his claim of actual innocence is not a bar to the claim, it is among the factors that the court may consider in

assessing the merits of the claim." *Arnold*, 901 F.3d at 837 (citing *McQuiggin v. Perkins*, 569 U.S. 383, 388–400 (2013)).

Petitioner cannot meet this heavy burden. In support of his actual innocence claim, Petitioner asserts that there is newly discovered evidence from eyewitnesses Rivera, Lanzarin, Figueroa, and Carranza, that the shooter was masked and that they were pressured by police to falsely identify him as the shooter. Petitioner also asserts that Sabrina Vazquez told police that Maldonado confessed to her that he committed the shooting. Further, Petitioner argues that Maldonado now admits responsibility for the shooting. However, this evidence is insufficient when viewed in context with all the evidence against Petitioner.

While, as acknowledged by the state postconviction appellate court, the new evidence raises some questions, when considered in context with all the evidence presented, Petitioner does not meet the high bar required to pass through the narrow actual innocence gateway. The *Schlup* standard requires more than a possible inference that might lead a juror to acquit, and instead requires the habeas petitioner to show that it is likely that no reasonable juror would have convicted him. *Gladney v. Pollard*, 799 F.3d 889, 899 (7th Cir. 2015). Petitioner's actual innocence claim relies largely on recantations by some of the eyewitnesses. However, courts generally treat recantations with a healthy dose of skepticism for several reasons including "the formality of a court, the presence of the litigants, and the gaze of a judge induce witnesses to hew more closely to the truth than they do when speaking in private and attempting to appease the losing side's advocate." *Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000). In *Cal v. Garnett*, the Seventh Circuit affirmed the denial of a habeas petition when the Illinois appellate court's factual determinations were not unreasonable, and the petitioner failed to show by clear and convincing evidence why the witness's recantation 15 years after the trial was reliable. 991 F.3d 843, 849 (7th

Cir. 2021). More specifically, in *Cal*, the Illinois appellate court had affirmed the finding that the recantation testimony 15 years after the trial was not credible, relying, in part, on the fact that the circuit court had the opportunity to evaluate the witness's demeanor at the evidentiary hearing. *Id.* In doing so, the court relied on the internal inconsistencies in the testimony, that the witness had no motive to lie at trial, and that he backpaddled out of loyalty to his former gang rather than a concern for justice. *Id.* at 850. While acknowledging that the new testimony cast some doubts, the Seventh Circuit found that given the highly deferential standard governing federal habeas review, the state court's determination was not unreasonable in light of the evidence.

Similarly, here the state postconviction court reviewed new affidavits and held an evidentiary hearing during which it could evaluate the witnesses' credibility. During that hearing, the state postconviction court did not find any of the witnesses to be credible, which the appellate court affirmed. Credibility findings by a state court, upheld on appeal, are generally "presumed correct." *Araujo v. Chandler*, 435 F.3d 678, 682 (7th Cir. 2005). Petitioner provided no reason for why the state court's credibility determinations cannot be relied on. Further, the state postconviction appellate court noted that Maldonado's statements regarding his own guilt shifted between his affidavits, both of which were filed twenty-plus years after he was convicted for his involvement in this shooting. He also did not testify at the evidentiary hearing, so he was not subject to cross-examination or available for the court to judge his credibility. All of which casts doubt on the reliability of the recantations. *Coleman v. Lemke*, 739 F.3d 342, 350 (7th Cir. 2014) (a codefendant's testimony can be found to not be credible if he presents conflicting accounts of what occurred). As with *Cal*, given the highly deferential standard governing federal habeas review, the Court cannot say that the postconviction court's determinations were unreasonable

given the length of time that has passed since the trial and the court's findings that the witnesses were not credible at the evidentiary hearing. *Cal*, 991 F.3d at 849–50.

Moreover, the state postconviction court also found that some of the evidence that supported Petitioner's conviction remained undisputed. For example, one of the state's witnesses, Littleton, did not recant his testimony, which included a detailed description of the shooter's face and a description of the shooter's eye, which corresponded with part of Lanzarin's testimony that he did not recant. The Seventh Circuit has found that even in cases where the state court found a witness's new testimony to be credible—which the state court did not find here—that is insufficient to establish an actual innocence claim and instead merely "adds a new voice to a highly complex, and often inculpatory, evidentiary record." *Wilson v. Cromwell*, 69 F.4th 410, 422 (7th Cir. 2023) (holding that the new testimony identifying a different gunman did not sufficiently establish the petitioner's innocence when other witness testimony supported his conviction). Further, the shotgun used in the shooting was found in Petitioner's home, providing direct physical evidence linking him to the murder.[5] *Garcia v. Cromwell*, 28 F.4th 764, 775–76 (7th Cir. 2022) (denying federal habeas relief when the evidence of guilt is overwhelming, including witness identifications and the gun found at the petitioner's residence matching the bullets recovered from the scene). Taking all the evidence into consideration, Petitioner has not shown that *no* reasonable juror would have convicted him. *Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016) (finding that new witness testimony eight years later that the petitioner was not the shooter is insufficient to meet the "demanding *Schlup* standard for actual innocence" when other witnesses identified petitioner, even if there is no physical evidence linking the petitioner to the crime); *Taylor v. United States*, 2019 WL 1489163, at *7 (N.D. Ill. Apr. 4, 2019) (refusing to apply the actual innocence exception

---

[5] Additional detail about the testimony at trial was discussed *supra* Background Section I.

when the witness recantation was not credible because it included inconsistencies and came five and a half years after the conviction). Without a strong showing of actual innocence required by *Schlup*, the petition and all claims therein are untimely, and the Court cannot address its merits.

### III. Ineffective Assistance of Counsel

While Petitioner asserts that his claim of actual innocence provides the Court with a gateway to evaluate his claims despite being time-barred, the petition, when read liberally, could also be construed as arguing that Petitioner provided new evidence that created the factual predicate for his claim that his trial counsel was ineffective for failing to investigate Vazquez's statements.[6] Neither Petitioner, nor Respondent directly address whether the petition makes this argument, but as courts are required to liberally construe *pro se* pleadings, the Court will consider this as an alternative argument.[7]

Under Section 2244(d)(1)(D), a federal habeas petitioner has a year to file a claim starting from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2254(d)(1)(D). Petitioner first raised this claim for ineffective assistance of counsel in his successive postconviction petition on July 8, 2009. This matter was pending in the state courts—thus the clock was tolled—until the Illinois Supreme Court denied Petitioner's leave to appeal on September 27, 2023, making the instant petition filed on October 2, 2023, timely. Doc. [20-25]. However, he also asserts that his trial counsel would have been aware of this evidence if he stayed at a hearing in front of the trial

---

[6] In Claim Four, Petitioner also appears to make claims of ineffective assistance of counsel related to investigating the other witnesses and interviewing Petitioner's girlfriend, but these claims were not raised in state court and thus are procedurally barred. Similarly, his ineffective assistance of appellate counsel claim was not raised in his successive postconviction petition in state court and is procedurally barred.

[7] Petitioner raised Claims One and Two in his direct appeal and there is no arguable basis that a new factual predicate exists. Thus, Section 2244(d)(1)(D) would only apply to Claim Four, which could plausibly be based on the new affidavits. Claim Three is discussed separately *infra* Section IV.

court on January 6, 1986, but counsel left the hearing. Doc. [22] at 7. If Petitioner has been aware of his counsel's failure since January 1986, then this claim is time barred. *See Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000), as amended (Jan. 22, 2001) (holding "the trigger in § 2244(d)(1)(D) is (actual or imputed) discovery of the claim's 'factual predicate', not recognition of the facts' legal significance."). However, as the Parties do not address whether Petitioner's discovery of his trial counsel's failure to investigate Vazquez creates a factual predicate to start a new clock for the statute of limitations, or when such a clock would have started running, the Court will assume without deciding that for the sake of evaluating Petitioner's claim of ineffective assistance of counsel, that he can proceed to the merits.

To succeed on an ineffective assistance of counsel claim, Petitioner must show that his counsel's representation fell below an objective standard of reasonableness and that his counsel's deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Surmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Moreover, the standards created by *Strickland* and § 2254(d) are "highly deferential" so "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.*

Federal courts can only issue habeas relief on a claim the state court adjudicated on the merits if that court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Schmidt v. Foster*, 911 F.3d 469, 476–77 (7th Cir. 2018) (en banc) (quoting § 2254(d)(1) & (2)). A state court decision is "contrary to" when it "applies a rule different from the governing law set forth" in Supreme Court cases or if it decides a case differently than the Supreme

29

Court did "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). An "unreasonable application" is when "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." *Id.* "To satisfy the high unreasonable application of bar, a habeas petitioner is required to show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Corral v. Foster*, 4 F.4th 576, 582 (7th Cir. 2021) (cleaned up) (internal citations omitted). This standard is difficult to meet, and a federal court may grant habeas relief "solely in those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making about federal constitutional claims is habeas relief appropriate." *Schmidt*, 911 F.3d at 477 (internal quotations omitted).

The state postconviction appellate court found the record reflected that Petitioner's trial counsel reviewed all the discovery and that he did not recall Vazquez or ever having interviewed her. Postconviction counsel affirmed that Vazquez's statement to police was made available in discovery. Vazquez testified during the evidentiary hearing that she was never contacted by the police or an attorney after giving her original statement. The Illinois postconviction appellate court evaluated Petitioner's ineffective assistance of counsel claim and found that while trial counsel's failure to interview or investigate Vazquez's statement fell below the level of reasonableness, he failed to establish prejudice.

In his federal habeas petition, Petitioner likewise asserts that his trial counsel was ineffective for failing to conduct a reasonable investigation into Vazquez and what she reported Maldonado told her shortly after the shooting. However, even assuming this was deficient, as the postconviction appellate court found, Petitioner still faces the second *Strickland* prong of showing actual prejudice.

To establish *Strickland*'s prejudice prong, Petitioner "must 'affirmatively prove prejudice,' meaning that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Dunn v. Jess*, 981 F.3d 582, 595 (7th Cir. 2020) (quoting *Strickland*, 466 U.S. at 693–94). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Petitioner does not argue that he was prejudiced or that the state court's application of *Strickland* finding that he was not prejudiced was an unreasonable application of the law.

The Court agrees with the state postconviction appellate court that Petitioner failed to establish that he was prejudiced. While Vazquez's testimony implicates Maldonado in the shooting, Maldonado was already convicted in a separate trial of being involved in the shooting. *Gage v. Richardson*, 978 F.3d 522, 530 (7th Cir. 2020) (finding no prejudice when the new witness testimony does not undermine the trial testimony that the assaults occurred). Further, Vazquez's testimony does not help Petitioner's alibi defense, because she did not see Petitioner that night and her testimony does not contradict the eyewitnesses who identified Petitioner as the shooter. New testimony that does not support a petitioner's defense, but instead implicates a codefendant is not sufficient to support a finding of prejudice. *Carter v. Duncan*, 819 F.3d 931, 948–49 (7th Cir. 2016) (finding no prejudice when the new testimony did not aid the defense's theory of the case). Finally, the postconviction court did not find Vazquez credible or her testimony compelling at the evidentiary hearing. Therefore, Petitioner cannot overcome the high hurdle necessary to surpass the "doubly deferential" standard applied to claims of habeas relief due to ineffective assistance of counsel. *Hicks v. Hepp*, 871 F.3d 513, 526 (7th Cir. 2017). Thus, as an alternative, the Court denies Claim Four on its merits.

IV.    **Claim Three**

Lastly, in Claim Three, Petitioner asserts that in denying his *pro se* postconviction petition, the state court held it to the more stringent standard of formal pleadings drafted by a lawyer. Respondent concedes that this claim may be timely as it relates to his third postconviction proceeding but argues that it is not a cognizable federal habeas claim as it relates to a state court committing state law errors in a collateral proceeding.

After the conclusion of the evidentiary hearing, the postconviction court entered an oral ruling which, in part, stated:

> I'm looking at what's been presented here today and I have decide if this somehow shows actual innocence, ineffective assistance of counsel, or somehow that this new information would have changed the results of the trial had it been available *** and I'm not in any way prepared to say it has come close to meeting any of those criteria under any standard that I could apply.

*People v. Hoddenbach*, 2023 IL App (1st) 092393-U, ¶ 139.  In doing so the state court, clearly indicated that Petitioner's claim fails under any standard, which necessarily includes the more liberal pleading standard granted to *pro se* petitioners.

What Petitioner appears to be arguing is that the state postconviction court improperly weighed the evidence he submitted in support of his state law actual innocence claim.  That claim is not appropriate for federal habeas review.  "No constitutional provision or federal law entitles a defendant to any state collateral review." *Jones v. Butler*, 778 F.3d 575, 586 (7th Cir. 2015) (quoting *Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997)).  "Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, errors in state collateral review cannot form the basis for federal habeas corpus relief." *Flores-Ramirez v. Foster*, 811 F.3d 861, 866 (7th Cir. 2016) (quoting *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996)).

Here, Petitioner does not assert an independent constitutional right was violated. Instead, he disputes the state court's finding that the evidence was not sufficient to support a claim of actual innocence. A state court's alleged errors in evaluating Petitioner's evidence and making credibility determinations of Petitioner's witnesses do not implicate a constitutional claim. *Jones*, 778 F.3d at 586 (declining to substitute the judgment of the state court about whether a witness's recantation was credible as the "decision was within the authority of the Illinois courts and did not implicate a constitutional claim."); *Cal v. Dorethy*, 430 F. Supp. 3d 482, 490 (N.D. Ill. 2019), *aff'd sub nom. Cal v. Garnett*, 991 F.3d 843 (7th Cir. 2021) (denying a petitioner's habeas claim because it alleged errors in evaluating evidence and did not make a constitutional claim). The Court is not in the position to override the state court's credibility judgments on the witnesses' new testimony and affidavits. Thus, Claim Three is denied.

## V.      Certificate of Appealability

As a final matter, pursuant to Rule 11 of the Rules Governing § 2254 Cases, the Court must either issue or deny a certificate of appealability. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (cleaned up). As explained above, Petitioner's claims are time-barred or otherwise without merit under AEDPA standards. Nothing before the Court suggests that reasonable jurists would debate the outcome of the petition or find a reason to encourage Petitioner to proceed further. Accordingly, the Court declines to issue him a certificate of appealability.

**Conclusion**

For these reasons, Petitioner's writ of habeas corpus pursuant to 28 U.S.C. § 2254 [1] is denied and Respondent's motion to dismiss [19] is granted. Judgment shall enter in favor of Respondent and against Petitioner.


**SO ORDERED.**

Dated:  September 10, 2024

_____
Sunil R. Harjani
United States District Judge